UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

WILLIAM BROCKHAUS,

                                  Plaintiff,

                  -v-

LUIS MIGUEL GALLEGO BASTERI
a/k/a LUIS MIGUEL,

                             Defendant.

-------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 19, 2016
```

15-cv-2707 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      This case involves a dispute arising out of a July 2012 personal services contract between defendant Luis Miguel Gallego Basteri ("Miguel" or "defendant"), a world-renowned music artist, and plaintiff William Brockhaus ("Brockhaus" or "plaintiff"), for Brockhaus to serve as Miguel's personal manager.

      Brockhaus brings this action to recover the following: 1) payment for personal services provided during the period between April 1, 2012 and June 30, 2012, under a quantum meruit theory; and 2) compensation owed to him under the contract for the period between July 1, 2012 up to termination, which plaintiff alleges was October 10, 2014, and defendant June 30, 2014.

      The Court held a bench trial on December 16, 2015, at which plaintiff and William Zysblat, Miguel's business manager and accountant, testified.[1]  The Court

---

[1]     The Court received the witnesses' declarations as their direct testimony.  They were then subject to cross-examination and redirect.  The Court found the testimony of both Brockhaus and Zysblat generally credible.

also received into evidence thirty-one documentary exhibits.  On January 6, 2016,

the parties submitted post-trial briefing.  This Opinion & Order constitutes the

Court's findings of fact and conclusions of law.  See Fed. R. Civ. P. 52.

I.     FINDINGS OF FACT[2]

       A.     Key People and Relationships

       Defendant Miguel is a world-renowned, award-winning Latin music singer.

He regularly performs concerts around the world.  (Brockhaus Decl. ¶¶ 2, 41.)

Miguel has traditionally used a combination of corporate entities and personnel to

handle the business aspects of his performances.  (Brockhaus Decl. ¶ 48; Zysblat

Decl. ¶¶ 2-8, 25-27.)  Miguel established Lion Productions, Inc. ("Lion Productions")

to contract for his performances and to receive funds from those performances.

(Zysblat Decl. ¶¶ 3, 15, 21.)  Lion Productions contracts with concert promotors and,

generally, receives payment for performances and makes any necessary deductions.

(Brockhaus Decl. ¶ 47; Zysblat Decl. ¶¶ 14-15.)  It receives Miguel's touring income

and that of a five- to seven-member mariachi band, backup singers, and dancers

who accompany him.  (Zysblat Decl. ¶¶ 20-21.)  Lion Productions also pays all

expenses associated with Miguel's tours, including paying sound and light costs,

supporting performers, and crew.  (Zysblat Decl. ¶ 24.)  Among the expenses paid by

---

Parties also designated deposition testimony of Brockhaus and Miguel.  (Tr. 87:15-99:20.)

[2]     The Court's findings of fact are based on determinations by a preponderance of the credible evidence.  See Scientific Components Corp. v. Sirenza Microdevices, Inc., 399 F. App'x 637, 638 (2d Cir. 2010).  The Court has also considered evidentiary objections lodged by the parties.  With regard to any objections to evidence cited in this Opinion not individually addressed, the Court finds that they are without merit.

2

Lion Productions are amounts owed to Miguel for his performances.[3]  (Brockhaus Decl. ¶ 47; Zysblat Decl. ¶¶ 18-19.)

Since 2004, Miguel has used William Zysblat and Zysblat's firm RZO, LLC as his business manager and accountant.[4]  (Tr. 75:15-19.)[5]  Zysblat insures that Miguel receives income due and pays amounts owed to others.  (Zysblat Decl. ¶¶ 7, 8, 35; Brockhaus Decl. ¶ 20.)

Over the years, Miguel has also employed a personal manager.  The personal manager has functioned as Miguel's eyes and ears for tours and performances, handling, <u>inter alia</u>, travel arrangements and issues that may arise with regard to a particular venue.  (Brockhaus Decl. ¶¶ 9-10, 15-16; Miguel Dep. Tr. 10:19-11:7.) The weight of the evidence is clear that Miguel did not delegate general authority to contract for a performance to his personal manager; and the personal manager also does not handle financial aspects of performances.  (PX 1 ¶ 5(c); Brockhaus Decl. ¶¶ 16, 19.)

This lawsuit concerns a payment claim by William Brockhaus, an individual who served as Miguel's personal manager in 2012-2013.  Alejandro Asensi functioned as Miguel's personal manager prior to plaintiff Brockhaus.  (PX 1; PX 2; Brockhaus ¶ 10.)

---

[3]       Miguel is both the sole owner and shareholder of Lion Productions.  (Brockhaus Decl. ¶ 47.)
[4]       In addition, Miguel's booking agent is William Morris Endeavor ("WME"), which negotiates with promotors who sponsor Miguel's live concerts.  (Zysblat Decl. ¶¶ 25-26.)
[5]       "Tr." refers to pages of the trial transcript, December 16, 2015.

B.    <u>Chronology of Events</u>

Plaintiff Brockhaus has known Miguel for nearly twenty years.  (Brockhaus Decl., ¶ 4.)  Plaintiff's wife and Miguel have been friends since childhood.  (<u>Id.</u>)

In August 2011, while they were on vacation together, Miguel asked Brockhaus, who was then employed as a sales executive for an auto manufacturing company, to serve as his personal manager to replace Asensi.  (Brockhaus Decl. ¶¶ 7, 10, 15-16, PX 1; PX 2; Miguel Dep. 10:19-11:7.)  During this initial conversation, Miguel and Brockhaus's discussion concerning compensation was general, but the evidence supports that they discussed that Brockhaus would be paid in the same manner as Asensi.  (Brockhaus Decl. ¶ 10.)  The evidence was also clear that Miguel did not, in fact, know how Asensi was paid.  For instance, in giving Brockhaus an example of how he believed commissions would be calculated, he told Brockhaus that he would be paid a 10% commission based on his (Miguel's) performance income and that if "his last tour grossed $50 million . . . I would make $5 million," or a 10% commission.  (Brockhaus Decl. ¶ 10; Tr. 20:17-20.)  As it turned out, the evidence at trial was unambiguous that no personal manager had ever been paid according to such a methodology (e.g., a straight commission; that is, based solely on gross performance income without deductions), and Brockhaus never expected to be paid in this way.[6]

---

[6]    That Miguel was wrong as to the compensation terms surprised no one as it was apparently generally assumed that Miguel did not concern himself or have specific information about the financial aspects of his performances.  (<u>See, e.g.</u>, Miguel Dep. Tr. 8:16-25, 31:19-21.)

Brockhaus accepted Miguel's offer.  (Brockhaus Decl. ¶ 11.)  While the parties would eventually sign a contract in September 2012 (effective July 2012), Brockhaus began providing certain services in October 2011 but continued to be employed in his prior job until April 2012.  (Brockhaus Decl. ¶¶ 12, 13, 17.)  Asensi also continued to be employed as Miguel's personal manager until the end of June 2012.  (Zysblat Decl. ¶ 48; Tr. 58:4-8, 58:16-23.)

In this lawsuit, plaintiff has asserted a claim for quantum meruit relating to payment for this period between April 2012, when he quit his prior job, and June 30, 2012, when his contract with Miguel became effective.  Plaintiff has failed to establish by a preponderance of the evidence that anyone agreed to pay him or expected that he would be paid for any services prior to Asensi's formal termination, and prior to the execution of plaintiff's contract.  Instead, the weight of the evidence demonstrates that there was never any expectation of payment for that initial period.  The evidence in this regard is, inter alia, the following:  Zysblat testified credibly that as of October 2011, there was no agreement—contractual or otherwise—that plaintiff would be compensated for his provision of services at this time.  (Tr. 57:20-23.)  Rather, Brockhaus, Zysblat and Miguel viewed Brockhaus as providing his services as a favor to Miguel, and to enable Brockhaus to learn the job.  (Zysblat Decl. ¶ 47; Tr. 64:25-65:8.)  There is no evidence that Brockhaus informed anyone that he expected to be paid during this period.  (Tr. 84:22-24.)  In addition, Asensi, the prior personal manager, remained under contract and was still working for Miguel.  (Zysblat Tr. ¶ 48; Tr. 58:4-8, 16-23.)  There is no evidence that

Miguel ever agreed to pay "double" commissions for Asensi and Brockhaus for the period in which Asensi's contract had not yet expired.  (Zysblat Decl. ¶ 48; Tr. 66:20-24, 67:4-11.)  Asensi continued to work until June 2012 and continued to earn commissions under his contract.  Asensi was "constantly in touch" with Zysblat "about what dates we're earning, what he was do[ing], accountings" and "calling ahead to make sure arrangements were in place."  (Tr. 58:4-23.)

     C.    <u>The Contract</u>

Miguel and Brockhaus entered into a contract (the "Contract"), effective July 1, 2012, pursuant to which Brockhaus would act as Miguel's personal manager. (PX 1.)  A primary issue in dispute in this case concerns the methodology used to calculate Brockhaus's commissions under this Contract.  As explained below, Brockhaus was paid only a few times during his period of employment and never according to any discernible methodology.  (<u>See</u> DX 5; Tr. 84:3-21.)

The parties agreed, and the evidence at trial supported that Brockhaus's contract was modeled on Asensi's.  The facts relevant to the Brockhaus Contract are as follows.

In the fall of 2011, Zysblat and Brockhaus communicated regarding how Brockhaus would be paid.  Zysblat sent him a sample of commission calculations based on the methodology then in use for Asensi.  At that time, the parties expected that Brockhaus would be paid using a similar methodology.  (PX 4; Tr. 11:12-22, 26:20-27:13.)  The document Zysblat sent in the fall of 2011 shows a commission formula based on Gross Revenue (tour income received by Lion Production) less a

number of deductions including commissions paid to WME and RZO, less expenses for "sound and light"[7] multiplied by a commission rate of 10%.  (PX 4; Brockhaus Decl. ¶ 30.)  This sample commission sheet was not accompanied by a draft contract; and there was no evidence at trial that the parties ever referred to that document during negotiations on the formal contract.

In February 2012, protracted negotiations on the Brockhaus Contract began in earnest.  Brockhaus was represented by his own counsel throughout the negotiations and he testified that he relied on his attorneys' advice regarding the Contract rather than materials previously received from Zysblat.  (Brockhaus Decl. ¶ 33; Tr. 9:13-25, 11:25-12:5, 12:10-20.)  While Miguel did not sign the Contract until September 2012, its effective date was July 1, 2012.  (PX 1; Brockhaus Decl. ¶¶ 33-34; Tr. 10:1-3.)

Over the period of his employment, Brockhaus was paid over $1.5 million.  (DX 5; Brockhaus Decl. ¶¶ 93-94; Tr. 9:9-12.)  The payments were made periodically in various lump sums:

- On December 10, 2012, $100,000.
- On March 7, 2013, $500,000.
- On March 24, 2013, $500,000.
- On September 23, 2013, $200,000.
- On October 8, 2013, $9,489.
- On November 25, 2013, $15,000.
- On January 28, 2014, $200,000.

---

[7]     These are defined as "sound and light expenses solely in respect of [Miguel's] live performances."  Also included in deducted expenses were "payments made to Live Nation in consideration of the termination of the June 2009 Touring Agreement not in excess of $218,000." (PX 1 at Ex. A.)

(PX 25; DX 5; Tr. 72:22-73:3.) [8]  None of these payments corresponded to a 10%

commission relating to one or more performances.  (See, e.g., PX 10.)  There was no

evidence at trial regarding how these payments were calculated.  Rather, the

evidence demonstrated that payments were made for amounts owed, without

reference to what total amount was owed or whether the amounts paid were in full

or partial satisfaction of that amount.  The parties' proffered damage calculations

are net of these amounts.  (Brockhaus ¶ 94; Zysblat ¶¶ 42-44.)

    D. The End of the Relationship

During the period from July 2012 to December 2013, Brockhaus provided

services pursuant to the Contract.  By the third quarter of 2013, for reasons never

explained to the Court, the relationship had "soured."  (Tr. 14:8-12.)

On October 8, 2013, Miguel's personal secretary, Joe Madera, orally informed

Brockhaus that Miguel intended to terminate the Contract before the end of its

term and that he should stop working and start looking for new work.  (Brockhaus

Decl. ¶ 65; Tr. 15:1-16.)   Brockhaus understood this statement to accurately reflect

Miguel's intentions; there was no evidence that Brockhaus was surprised by the

statement, that it did not reflect Miguel's views or that it was contingent in any

way.  (Brockhaus ¶ 65; Tr. 15:6-9.)  On October 22, 2013, Brockhaus wrote an email

to Madera in which he acknowledged Miguel's instruction and that he had "stopped

working on new projects per your request."  (PX 14 at 3; Brockhaus Decl. ¶ 65.)

---

[8]      Brockhaus had also submitted receipts for reimbursements for $75,000 to Zysblat at some
point, which Zysblat paid, but it is not clear if that figure is reflected in the above payments.  (Tr.
13:5-7.)

There was no dispute at trial that this email was in fact written and sent by Brockhaus.  In the first quarter of 2014, Madera and another Miguel employee again orally informed Brockhaus that Miguel did not plan to renew the Contract. (Tr. 14:13-15:9.)  Thereafter Brockhaus and Zysblat had numerous communications—some written, others oral—regarding an early termination buy-out agreement.  (Brockhaus Decl. ¶ 66.)  The evidence at trial demonstrated that the issues under discussion concerned whether the effective date of termination would be prior to the Contract's expiration in July 2014, and the amount of any buyout payment.  There was no evidence at trial that either Brockhaus or Miguel (or Miguel's representatives) ever questioned that the Contract was at an end.  In fact, the evidence was entirely to the contrary:  the parties to the Contract knew, based on the exchange of written communications accompanied by various oral ones, that the contractual relationship was over.  Actions here speak at least as loudly as the written words:  Brockhaus did not perform any services after the first quarter of 2014.[9]  (PX 14 at 3; Tr. 9:3-8.)  He also began to negotiate the terms of an early buyout.  (Brockhaus Decl. ¶ 66.)

On March 11, 2014, Zysblat sent an email to Brockhaus regarding the potential buyout agreement.  (PX 15; Tr. 69:3-9.)  Zysblat stated that he was "authorized to offer you $1,400,000" and that if Brockhaus accepted, "[a]t least you

---

[9]      Brockhaus argued at trial, rather half-heartedly, that Miguel had changed his mind before and might again.  The evidence on this point was weak.  Brockhaus pointed to an instance in which Miguel had fired a guitar player only to hire him back twenty minutes later, (Tr. 32:2-33:3), and another where Miguel put a million dollars in down payment on a condominium and then decided not to purchase the property, (Tr. 33:4-17.)  The Court does not accept that Brockhaus in fact viewed the termination of his Contract as open to doubt.  He knew it was over.

would have a settlement signed sealed and delivered and not have to worry about it in the future." (PX 15.)  The evidence at trial demonstrated that Zysblat was negotiating on behalf of Miguel but did not have authority to "close a deal." (Tr. 69:13-16.)

Brockhaus received a draft of a buyout and termination agreement in April 2014. (DX 6; Tr. 17:6-11.)  He subsequently expressed dissatisfaction with certain terms. (DX 6; Tr. 17:2-18:6.)[10]  The parties continued to negotiate until August 2014. (Brockhaus Decl. ¶ 67.)  On August 19, 2014, Brockhaus signed a version of the agreement which provided for a retroactive termination date as of January 1, 2014 and payment of $1,440,000. (PX 16 ¶ 2.) Miguel never signed the agreement. (PX 16; Brockhaus Decl. ¶ 67.)

Issues regarding whether proper notice to terminate the contract had been provided surfaced in early September 2012.  Early that month, Brockhaus stated to Miguel's attorney, James Zelloe, "my management contract with [Miguel] is still in effect and has never been cancelled." (PX 18.)  There is no evidence in the record that this issue had been raised at any earlier point in time.  To insure that such agreement would at least be limited, but without conceding the merits of such argument, on September 10, 2014, Zelloe sent Brockhaus an email stating that, pursuant to the Contract's 30-day notice provision, the contract was being terminated effective October 10, 2014. (PX 18; Brockhaus Decl. ¶ 68; Tr. 34:11-22.)

---

[10]     The draft sent to Brockhaus originally stated that the date of termination is December 31, 2013, and Brockhaus suggested that the effective date should instead be May 31, 2014. (Tr. 17:19-18:10.)

As discussed above, by this time, Brockhaus had been paid approximately $1.5 million.  In this lawsuit, he seeks additional payments of $399,852 under a quantum meruit theory for the initial, pre-contract period between April 1, 2012 and June 30, 2012, and $1,869,987 for breach of contract damages for the period between July 1, 2012 and October 10, 2014.  (Brockhaus Decl. ¶ 106.)

E.  Contract Terms[11]

As stated, the Contract is between Miguel personally and Brockhaus.  It is drafted in language consistent with this structure.  For instance, it is on personal letterhead for Miguel (and not, for instance, Lion Productions) and contains references in the initial paragraph to "your and my understandings" and "your engagement by me as my personal manager," etc.  (PX 1, at 1.)  The use of personal references continues throughout the Contract.

1.  Pre-contract period

The Contract had an effective date of July 1, 2012.  (PX 1, at 1.)  It also explicitly states that it is not effective until Miguel has "properly terminated my existing agreement for personal management services with Alejandro Asensi."[12] (PX 1 at 1; Tr. 12:21-13:2.)  Asensi's contract was terminated on June 30, 2012.  (Zysblat Decl. ¶ 48.)

---

[11]     The Contract provides that it "may only be modified by a written instrument signed by both parties."  (PX 1 ¶ 13(d).)

[12]     The Contract also contains an integration clause, which states, "This agreement constitutes the entire agreement by and between you and me regarding the subject matter hereof and may only be modified by a written instrument signed by both parties.  This agreement will supersede any and all prior verbal or written agreements between you and me."  (PX 1 ¶ 13(d).)  The Court finds that the presence of this integration clause provides that the Contract supersedes any understandings as to how commissions would be paid resulting from Brockhaus's initial conversation with Miguel or the commission schedule Zysblat sent him in the fall of 2011.

2.   Definition of commissions

The Contract provides for Brockhaus to be paid according to a formula set forth in a section entitled "Payments and Commissions."  Neither party has claimed that this provision is ambiguous.  This section provides:

> In full compensation for your services hereunder, I will pay to you a commission of ten percent (10%) of my Gross Income (as hereinafter defined). As used herein, the term "Gross Income" means all gross monies or other considerations earned by me during the Term, and received by me or on my behalf during or after the Term, which monies or other considerations are derived from services rendered by me and products created by me, in whole or part, during the Term, throughout the entertainment field and throughout the world ("Term Product").   Notwithstanding the foregoing, "Gross Income" shall exclude the items set forth on Exhibit "A" attached hereto and incorporated within (I am referred to in Exhibit "A" as "Artist" and you are referred to therein as "Manager").

(PX 1 at 1.)[13]  Before the commencement of trial, the parties briefed whether parol evidence as to the meaning of this provision should be allowed.  The Court ruled that the provision was unambiguous and that parol evidence would not be allowed. In that ruling, the Court found that under a plain reading of the Contract, while the earnings Miguel received from Lion Productions on his behalf constitute income "earned by" Miguel under the Contract, what portion of amounts received by Lion Productions are attributable to Miguel personally was a question for the trier of fact.  (Nov. 20, 2015 Order (ECF No. 71).)  The Court referred to the language of the provision defining "Gross Income" as including amounts received "directly or

---

[13]      The Contract further defines "gross monies or other considerations" as "salaries, earnings, fees, royalties, bonuses, shares of profit and other participation, shares of stock, partnership interests, percentages and the total amount paid for a packaged television or radio program (live or recorded), motion picture or other entertainment package, earned or received directly or indirectly by me or by my heirs, executors, administrators, or assigns, or by any other person, firm, or corporation on my behalf."  (PX 1 at 2.)

indirectly" and "by any other person, firm or corporation on my behalf."  Based on the undisputed evidence, the Court found that defendant was the sole owner of Lion Productions and that it had received amounts on his behalf.  (Id. at 5.)  The Court further found that there was a triable issue as to whether amounts received by Lion Productions were received on behalf of others who perform with the defendant, such as the mariachi band, the backup musicians, the dancers, and the crew (referred to here as "Other Performers and Crew"), and if so, the quantum of any such payments.  (Id. at 6-7.)

At trial, Zysblat's testimony was uncontroverted that, in fact, Miguel performs with a number of associated Other Performers and Crew.  The contracts into which Lion Productions enters for performances are structured such that Lion Productions receives all payments on behalf of all performers and crew and Lion Productions then allocates those sums accordingly.  (PX 8, 9, 10; Zysblat Decl. ¶ 24.) Zysblat's testimony that these individuals were paid by Lion Productions, and that amounts attributable to them (or, for their expenses) were included in Lion Productions's total gross income was also uncontroverted.  Finally, Zysblat testified as to the quantum of amounts received on behalf of other performers and crew; this testimony was similarly uncontroverted.  (DX 5; Zysblat Decl. ¶¶ 21, 32-33.)  In sum, plaintiff offered no evidence to controvert the basic points that amounts paid to Lion Productions included amounts earned by individuals other than Miguel, and covered expenses for other individuals.

13

While the parties disagree on what the denominator for "Gross Income" is, they do agree that Exhibit A of the Contract contains a list of twelve deductions. The provision relevant to this action is referred to as the "sound and light expenses." That provision states:

> (iv) Monies actually paid by or on behalf of Artist to any booking agent or business manager as commissions solely in respect of Artists' live performances, so-called "sound and light expenses" solely in respect of Artists' live performances, and payments made to Live Nation in consideration of the termination of the June 2009 Touring Agreement not in excess of $218,000.

(PX 1 at 6.)

From the above, it is obvious that a key factual dispute between the parties is whether the methodology under the Contract provided that Brockhaus would be paid: (1) based on gross amounts Miguel personally received through Lion Productions, exclusive of "sound and light" expenses as well as amounts paid to Lion Productions for Other Performers and Crew ("first methodology"); or (2) based on all gross amounts received by Lion Productions net only of sound and light (but, in other words, inclusive of amounts payable to Other Performers and Crew) ("second methodology").[14]

The parties have stipulated to the gross revenue figures for tours undertaken during the contract period, as well as the relevant Exhibit A deduction amounts. (Joint Pretrial Order ¶¶ 9-16.)  Defendant calculated the amount owed to plaintiff under the Contract using the first methodology.  That amount totals $549,776.85.

---

[14]      As the Court determined in the motion in limine decision, the Contract is unambiguous and parol evidence is therefore inadmissible to alter its terms.  In all events, there is no evidence in the record that Brockhaus and Zysblat ever discussed the payment methodology after the Contract was signed but prior to negotiations as to a buyout amount.

(DX 5; Zysblat Decl. ¶¶ 28-44.)  Zysblat's calculation excludes "sound and light" as well as costs relating to Other Performers and Crew.[15]  Brockhaus proffered no evidence that, if the first methodology is used, Zysblat's calculation was incorrect. For instance, Brockhaus proffered no evidence that Zysblat incorrectly deducted amounts attributable to Other Performers and Crew.  At trial, plaintiff continued to contend that the second methodology was the correct one.  This, as discussed above, is not supported by the plain language of the Contract and is therefore incorrect.

### 3. Termination clause

On its face, and in the absence of earlier termination, the Contract's term spanned the period from July 1, 2012 through June 30, 2014.  It provided for automatic renewal unless either party "delivers to the other party thirty (30) days' written notice of his election to terminate this agreement and its term."  (PX 1 at 1.)[16]  As set forth in the facts above and the Conclusions of Law below, written notice that the Contract would not be renewed was received several times during the period prior to June 30, 2014.

---

[15] Any expenses "directly attributable to Miguel" including "security, wardrobe, hair stylist, 'A' party hotels, taxes, and charter transportation" were not excluded.  And because promoters generally do not break out costs for Miguel versus for supporting performers, crew, and other elements, (Tr. 61:18-62:2), Zysblat used an estimate, 75%, as the figure of crew support that did not go towards Miguel, (Zysblat Decl. ¶ 33), and excluded this amount.  (See DX 5.)  This figure also includes the commission in a separate Acapulco real estate deal.  (Zysblat Decl. ¶ 41.)  Plaintiff offered no evidence to controvert these figures.

[16] A separate early termination provision relating to failure to perform was separately included in Paragraph 11 of the Contract.  (PX 1 ¶ 11.)  This provision is irrelevant to this dispute.  The parties do not contend that such early termination occurred.

4.  <u>Attorney's fees</u>

The Contract also provided that "[i]n the event that any action, suit, or proceeding arising from or based upon this agreement is brought by either party hereto against the other, the prevailing party shall be entitled to recover from the other his reasonable attorneys' fees in connection therewith in addition to the costs of such action, suit, or proceeding."  (PX 1 ¶ 13(c).)  Defendant does not contest that because plaintiff is entitled to recovery of compensation under the Contract, he is also entitled to reasonable attorneys' fees.  (Brockhaus Decl. ¶ 106.)

II.   CONCLUSIONS OF LAW[17]

Resolution of plaintiff's claims requires this Court to decide the following three issues: 1) the correct methodology to calculate commissions owed; 2) the effective termination date for the Contract, and 3) whether plaintiff is entitled to payment under <u>quantum meruit</u> for the period before the Contract became effective (April 1, 2012 to July 1, 2012).

A.   <u>Commissions Owed</u>

The question of how to calculate commissions Miguel owes to Brockhaus is governed by longstanding principles of contract law.  Courts interpret contracts to give meaning to the parties' intent.  <u>Klos v. Lotnicze</u>, 133 F.3d 164, 168 (2d Cir. 1997).  "When interpreting an unambiguous contract, words and phrases are given their plain meaning.  Under New York law, therefore, a court must enforce that plain meaning, rather than rewrite an unambiguous agreement."  <u>Krumme v.</u>

---

[17]     New York law governs the Contract.  (PX 1 ¶ 13(f).)

WestPoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000) (internal citations,
quotation marks, and alternations omitted)); Terwilliger v. Terwilliger, 206 F.3d
240, 245 (2d. Cir. 2000) ("[M]atters extrinsic to the agreement may not be
considered when the intent of the parties can fairly be gleaned from the face of the
instrument."). The Court does not take parol evidence into consideration if the
words of the Contract are clear. If the intent of parties "is discernible from the plain
meaning of the language of the contract, there is no need to look further." Evans v.
Famous Music Corp., 1 N.Y.3d 452, 458 (2004). This is so even if the parties to a
Contract later express a different understanding of what are otherwise clear terms.
Metro. Life. Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 888, 889 (2d Cir. 1990)
("Language whose meaning is otherwise plain is not ambiguous merely because the
parties urge different interpretations in the litigation.") Here, the language of the
Contract is straightforward and unambiguous.

The Contract is drafted as a personal agreement between Miguel and
Brockhaus (recall the fact that it was on Miguel's letterhead and there are
references throughout to "me," "my," and "you"). (PX 1.) The arrangement was one
involving personal support for Miguel himself in connection with his performances.
The paragraph on commissions continues the usage of these personalized terms. It
first provides that plaintiff's commission will be 10% of "my" gross income. It then
defines this further as having two parts separated by the word "and": (1) "all gross
monies earned by me" and (2) "received by me or on my behalf." (Id.) The core
dispute between the parties is whether all amounts paid to Lion Productions

17

relating in any way to Miguel's performances constitute his "gross income" as defined in the personal services contract, or whether "his" gross income is the amount paid to him, or to another entity for him, personally. This Court acknowledges that there is some attraction to the former argument as no performances would occur but for Miguel. In some sense all amounts paid to Lion Productions could be construed as "for" his performances. However, based on the Court's review of the Contract in its entirety, it is persuaded that this argument is incorrect.

It is important to start at the beginning of the Contract, which evinces that it is a personal agreement between Miguel himself and Brockhaus. It was not an agreement between Lion Productions and Brockhaus; Brockhaus was not hired to provide personal services to anyone other than Miguel himself. The evidence also confirms that Lion Productions was the contracting party for performances; "it" was paid for those performances; Miguel himself was paid only through Lion Productions, and he was paid an amount less than the full amount paid to Lion Productions. The evidence from Zysblat at trial confirms that there are a number of Other Performers and Crew as to whom Lion Productions received payment and for whom it paid expenses. While it is true that those individuals and Miguel together provide the performances as a whole, there was no evidence as to whether the performance contracts acknowledge or ignore the fact of the additional people. Thus, plaintiff has not carried his burden of proof to show that as a matter of fact, all payments to Lion Productions were earned by Miguel versus partially earned by

18

others.  Instead, plaintiff relies on argument and speculation that as Miguel is "the name," it must be so.  Zysblat, however, presented evidence from defendant that it is not so, and this evidence went uncontroverted.  Zysblat discussed the Other Performers and Crew members and amounts "earned by them" but also paid to Lion Productions.  (Zysblat Decl. ¶ 24.)  In the face of this one-sided record, the Court concludes that the amounts "earned by me" for Miguel are those personally attributable to him only.  The amounts earned by Miguel personally are further subject to deductions for sound and light.  Using this methodology, plaintiff is owed $549,776.85 for the period between July 1, 2012 and June 30, 2014.  (Zysblat Decl. ¶¶ 42-43.)

As support for his argument, plaintiff points to the phrases "during the Term" or "after the Term" that follow the phrases "by me" or "on my behalf."  Thus, according to plaintiff, the "by me" or "on my behalf" concerns only the period of <u>time</u> that the Contract governs—i.e., "earned by me during the Term" and not any other period of time.  This is incorrect.  Limiting the phrases to concerning solely the limited time period for inclusion of what is earned or received renders the phrases "by me" and "on my behalf" superfluous, and thus is incorrect.  <u>See</u> <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 250 (2d Cir. 2003); <u>see also</u> <u>Two Guys from Harrison-N.Y. Inc. v. S.F.R. Realty Assocs.</u>, 63 N.Y.2d 396, 403 (1984).  Further, it ignores the overall structure of the Contract.

B.    <u>Contract Termination</u>

The Contract renewed automatically on June 30, 2014 unless either party unilaterally provided thirty days' written notice.  (PX 1 at 1.)  The legal question is "what constitutes sufficient written notice?";  the factual question is whether such notice was given.

Under N.Y. Gen. Oblig. Law § 15-301[4], "If a written agreement or other written instrument contains a provision for termination or discharge on written notice by one or either party, the requirement that such notice be in writing cannot be waived except by a writing signed by the party against whom enforcement of the waiver is sought[,] or by his agent."  <u>See also</u> <u>Israel v. Chabra</u>, 12 N.Y.3d 158, 166-67 (2009) (answering certified question by 537 F.3d 86 (2d Cir. 2008).  No party here has asserted a waiver.  In addition, where the contract does not require any particular language in the notice of termination, there are no magic words that need to be uttered as long as the notice evinces clear intent to terminate.  <u>See</u> <u>G.B. Kent & Sons, Ltd. V. Helena Rubinstein, Inc.</u>, 47 N.Y.2d 561, 561 (1979) (holding that even a notice of termination that "erroneously identifies the termination date is nonetheless sufficient to effect a termination as of the first proper termination.");  <u>see also</u> <u>Schwartz v. Fortune Magazine</u>, 89 F. Supp. 2d 429, 433 (S.D.N.Y. 1999) (hold that where a contract is "silent about what the written notice [of pre-termination] should say," no specific words were required to effect termination);  <u>DKR Soundshore Oasis Holding Fund Ltd. v. Merrill Lynch Int'l</u>, 914 N.Y.S.2d 145, 147 (App. Div. 2011).  A contractual requirement for a writing evinces an intent to

avoid ambiguity or mistake.  Here, the parties agreed that oral communications regarding termination would not be enough.

There is no doubt that Brockhaus had actual notice of Miguel's intention to terminate the contract by October 2013 when he acknowledged as much in an email to Madera.  (PX 14.)  As the Contract requires written—not actual—notice to prevent automatic renewal, the question for this Court is whether the writings between the parties, none of which are signed, are sufficient.  The Court finds that on the particular facts here where numerous writings confirmed termination implicitly and explicitly, they are sufficient to fulfill the contractual requirements.

There is no dispute that plaintiff first received oral notice of termination. This alone would be insufficient to fulfill the contractual requirement of a writing. It was followed, however, by a number of writings reflecting notice that the relationship was terminated and the Contract would not be renewed.  The email Brockhaus wrote to Madera clearly indicates the Contract is over.  The draft termination agreement is similarly clear, unambiguous, and unequivocal that the relationship is at an end.[18]  As to all writings, the remaining open issue between the parties is the effective date of termination.  Taken singly or together, the writings constituted the necessary written notice that the Contract would not be renewed beyond its end date, June 30, 2014.  That the parties continued to negotiate

---

[18]    Defendant argues that the draft termination agreement, which plaintiff received in April 2014, constitutes sufficient written "notice" of termination.  The draft termination agreement included a statement of intention to terminate the Contract for personal services, a payout provision, and an effective termination date.  (See DX 6; PX 16.)  The fact of termination was never the subject of negotiation or dispute.  It was accepted by the parties as fact and there were writings reflecting that.

whether the termination could occur even earlier—such as December 31, 2013—
does not change the fact of the written notice of intent to terminate was contained
in writings that happened to be unequivocal and unambiguous.  See G.B. Kent., 47
N.Y.2d at 561.  Here, Brockhaus had written notice that Miguel intended to
terminate the Contract more than thirty days prior to the end of the Contract's term
on June 30, 2014.  Thus, the effective date of termination was June 30, 2014.
Accordingly, the amount of contractual commissions owed to Brockhaus is, as stated
above, $549,776.85.  Plaintiff is also entitled to reasonable attorneys' fees under the
Contract.

   C.   Quantum Meruit

   Plaintiff's quantum meruit claim fails.  Plaintiff's quantum meruit claim is
governed by Texas law; it is where plaintiff resided and where he performed the
terms of the quasi-contract.[19]  (See Compl. at ¶¶ 10-11.)  There is no evidence that
plaintiff performed any services in New York.

   To recover for quantum meruit under Texas law,[20] there must be a "promise
implied by law to pay for beneficial services rendered and knowingly accepted.

---

[19]    In determining which state's law applies to plaintiff's quantum meruit claims, we first look
to the choice-of-law rules of New York, where this Court sits.  See Fieger v. Pitney Bowes Credit
Corp., 251 F.3d 386, 394 (2d Cir. 2001).  New York choice-of-law rules require that the state with
the most significant relationship is the state whose laws apply.  Id. (citing Zurich Ins. Co. v. Shearson
Lehman Hutton, Inc., 618 N.Y.S.2d 609, 612 (1994)); see also Restatement (Second) of Conflict of
Laws § 188 (1971).  Under the most-significant-contacts test, the Court considers several factors:
"the places of negotiation and performance; the location of the subject matter; and the domicile or
place of business of the contracting parties."  Id.
[20]    Parties appear to agree that Texas law governs the quantum meruit claim.  (See Pl.'s Post-
Trial Mem. of L. at 16 (seeking attorney's fees for the claim based on a Texas statute).)  Plaintiff's
prior belief in the applicability of New York law over the quantum meruit claim appears to be based
on an incorrect belief that "there is not any material difference" between the law of the two states.

Specifically, plaintiff must prove: "(1) valuable services and/or materials were furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." Purselley v. Lockheed Martin Corp., 322 Fed. App'x. 399, 403 (5th Cir. 2009) (quoting Heldenfels Bros., Inc. v. Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992)).

There is no question that Brockhaus offered managerial services that were accepted by Miguel between April 1 and July 1, 2012.  However, Brockhaus did not notify Miguel that he expected to be paid for this period, and prior to the lawsuit, never sought payment for that period from Zysblat.[21]  (Tr. 84:22-24.)  This bars Brockhaus from recovery.  See Gen. Capital Grp. Beteligungsberatung GMBH v. AT & T, 407 S.W.3d 507, 513 (Tex. App. 2013) (finding no basis for recovery in quantum meruit because defendant did not expect to pay plaintiff); Collins & Aikman Floorcoverings, Inc. v. Thomason, 256 S.W.3d 402, 408 (Tex. App. 2008) (holding that because trial testimony established that plaintiff did not expect to be paid at the time he rendered services and did not notify the other party of any expectation, the fourth element of quantum meruit was not established).  Brockhaus knew he had to eventually enter into a contract with Miguel because—in his words—the contract would "make sure that [he] was going to be compensated."  (Brockhaus Dep. Tr. 79:5-7.)  In addition, Miguel did not intend to pay two commissions to two

(See Pl.'s Proposed Findings of Fact & Conclusions of L., ¶ 131 (stating that plaintiff was based in Texas "at the time he was defendant's personal manager" and citing Texas law).).
[21]      The reimbursement for expenses that Zysblat processed did not concern payment for services at issue here.

personal managers, (Zysblat Decl. ¶ 48; Tr. 66:20-24), and it is undisputed that he already paid the prior manager Asensi for the period prior to July 1, 2012.  (PX 6, at 1; Brockhaus Decl. ¶ 99.)[22]  The Court also notes that the effective date of the Contract was deliberately backdated to July 1, 2012, as Miguel did not sign the contract until November 2012.  If the parties had intended for plaintiff to be paid for the period prior to July 1, 2012, they would have negotiated for such a term.  The Contract also contains an explicit statement that the terms are not effective until the termination of the prior manager, as well as an integration clause that states it is the "entire agreement" between the parties.  (PX 1.)  This language evinces the intent of the parties that Brockhaus would not be paid prior to the start of the Contract on July 1, 2012, but rather would be rewarded solely via the Contract commissions.

Because plaintiff cannot establish the fourth element of a <u>quantum meruit</u> claim, he cannot recover payment for the period before the Contract took effect on July 1, 2012.

---

[22]     Moreover, even if Brockhaus had reasonably informed Miguel of his expectation to be paid for April 1 to July 1, 2012 and thereby satisfied the liability elements of <u>quantum meruit</u>, Brockhaus nevertheless cannot recover for damages because he has not met the burden of proof in demonstrating the "reasonable value of the work performed as beneficial services rendered" for the period at issue.  <u>M.J. Sheridan & Son Co. v. Seminole Pipeline Co.</u>, 731 S.W.2d 620, 625 (Tex. App. 1987); <u>see also</u> <u>Sullivan v. Leor Energy, LLC</u>, 600 F.3d 542, 550 (5th Cir. 2010) ("The measure of damages in <u>quantum meruit</u> is the 'reasonable value of the work performed.'").  Other from the eventual Contract, Brockhaus has not provided evidence of what is the "reasonable value" of his services.  While the contract price can serve as evidence of reasonable value, <u>Montclair Corp. v. Earl N. Lightfoot Paving Co.</u>, 417 S.W.2d 820, 831 (Tex. Civ. App. 1967), it is not the sole factor, and plaintiff does not satisfy his burden of proof in this regard.

24

III.    CONCLUSION

For the foregoing reasons, the Court finds that the Contract was effective between July 1, 2012 and June 30, 2014.  Plaintiff is owed payment under the Contract pursuant to the first methodology for calculating the commission—that is: based on gross amounts Miguel personally received through Lion Productions, exclusive of "sound and light" expenses as well as amounts paid to Lion Productions for Other Performers and Crew.  Finally, plaintiff may not recover under <u>quantum meruit</u> for the period prior to the Contract's effective date of July 1, 2012.

Parties shall submit a form of order consistent with this Opinion and Order within **10 days**.  Plaintiff shall make any application for the amount of reasonable attorneys' fees under the Contract within **21 days**.  Defendant shall file any opposition within **14 days.**


SO ORDERED.

Dated:      New York, New York
            May 19, 2016


_____
    KATHERINE B. FORREST
    United States District Judge